An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-641

Filed 4 March 2026

Caldwell County, No. 23JT000027-130

IN THE MATTER OF: A.C-M.J.

Appeal by respondent-mother from orders entered 18 March 2025 by Judge Mark L. Killian in Caldwell County District Court. Heard in the Court of Appeals 27 January 2026.

>    *Parent Defender Annick Lenior-Peek, by Assistant Parent Defender Benjamin J. Kull, for respondent-appellant mother.*
>
>    *Stephen M. Schoeberle for petitioner-appellee Caldwell County Department of Social Services.*
>
>    *N.C. Guardian Ad Litem Office, by Matthew D. Wunsche, for guardian ad litem.*

WOOD, Judge.

Respondent-Mother ("Mother") appeals from the trial court's order terminating her parental rights to her minor daughter A.C-M.J. ("Aurelia").[1] Mother argues the trial court erred because (1) the termination was not supported by the evidence; and (2) the determination that she was unfit is a logical impossibility based on the facts of the case. For the reasons set forth below, we affirm the trial court's termination of Mother's parental rights.

## I. Factual and Procedural Background

Mother has a significant history of domestic violence. In 2020, Mother's two oldest minor children were removed by the Caldwell County Department of Social Services ("DSS") due to concerns of domestic violence in the home and Mother's inability to safely parent her minor children. Two years after DSS intervened, Mother voluntarily relinquished her parental rights to her two oldest children. Both children were adopted in September 2022.

Aurelia was born on 28 May 2021. On 16 February 2023, DSS once again became involved with the family after a severe domestic violence incident occurred between Mother and her husband ("Husband"), Aurelia's presumed biological and legal father. Mother frequently left Husband due to incidents of domestic violence but continued to return to him. This pattern was consistent with her previous

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

behavior which prompted DSS involvement with her two older children. Mother had obtained four domestic violence protection orders against Husband prior to DSS's reinvolvement, the most recent of which was obtained in January 2023.

The family had previously resided in Burke County but were evicted from their residence due to multiple incidents of domestic violence and an instance where Husband, while the sole caretaker of Aurelia, caused a fire in the kitchen while cooking methamphetamine.

On 17 February 2023, DSS filed a petition alleging Aurelia was neglected due to the continuous and unresolved domestic violence, the loss of housing, and Husband's drug activity. DSS was granted nonsecure custody of Aurelia and authorization to obtain a drug screening of her hair.

An adjudication hearing was held during the 21-22 March 2023 session of Juvenile Court. On 6 April 2023, the trial court filed its adjudication order adjudicating Aurelia to be a neglected juvenile. The trial court found that Mother's Husband was now deceased and that another man was Aurelia's putative father ("Father"). Father was a prior boyfriend of Mother with whom she also had a history of domestic violence. Father was the biological father of one of the two older siblings; however, his parental rights to the older child were involuntarily terminated on 3 March 2022.

The trial court noted Mother was living in a domestic violence shelter and receiving services but could not provide the necessary care to Aurelia. Father had

not been located for service. Aurelia had also tested positive on a hair follicle drug screen for amphetamines and methamphetamines. The trial court found that it was in Aurelia's best interest to remain in foster care. The trial court set the permanent plan as reunification and ordered a paternity test. The trial court also ordered Mother to (1) complete a Comprehensive Clinical Assessment ("CCA") and follow all recommendations; (2) complete a Domestic Violence Assessment and follow all recommendations; and (3) refrain from drug use.

On 16 May 2023, the trial court held the initial permanency planning hearing. The trial court found that after Husband's death Mother left the domestic violence shelter and found an apartment. She was scheduled for her CCA on 11 May 2023 but was unable to afford the $10.00 fee to obtain the report. The trial court also noted that Mother was pregnant. The trial court found that Father had not been located and had not availed himself of any services from DSS, consistent with his refusal to engage with DSS during the prior case for their older child. The trial court continued the permanent plan of reunification and added a secondary plan of adoption. The trial court ordered Mother to complete her CCA, complete domestic violence services, inform DSS of any domestic violence, obtain and maintain safe housing for six months, inform DSS of all housing with all residents completing background checks, maintain employment, complete a parenting capacity assessment, and demonstrate parenting skills during visitation.

On 15 November 2023, Mother filed a complaint for a Domestic Violence Protection Order against Father stating that he had shown up at her home, had refused to leave, and had taken her phone. Mother reported that he told her that he had active warrants and did not want police to find him.

On 13 December 2023, the trial court held another permanency planning hearing. Father, who was incarcerated at that time, was transported to court for the hearing. DSS requested that the trial court cease video calls between Mother and Aurelia at the foster family's home due to privacy concerns and reduce in-person visitation with Mother. The trial court terminated the video calls but maintained the in-person visitation schedule. Because Father's prior appointed counsel had been discharged for Father's failure to attend scheduled hearings, new counsel was appointed. The trial court continued the matter to allow Father time to consult with his new counsel.

On 19 March 2024, a subsequent permanency planning hearing was held. The trial court found that Mother had completed the parenting capacity assessment with Dr. Jennifer Cappelletty ("Dr. Cappelletty"). This was mother's second assessment with Dr. Cappelletty as she had conducted a previous assessment in 2021 during Mother's case concerning her two older children.

Dr. Cappelletty testified Mother had a sound knowledge base of parenting skills, with the concern not being Mother's lack of understanding but her repeated failure to follow through with what she knew were better decision-making patterns

when it came to protecting her children and refraining from domestic violent relationships with abusive men. For instance, Mother reported to Dr. Cappelletty that she had previously whipped one of her children with a belt in order to keep the peace with Husband, even though she did not want to whip the child. Dr. Cappelletty testified that the Psychological Test Results were largely invalid, likely because of Mother failing to answer questions in a forthright manner. Similarly, the Parenting Stress Index also did not produce a valid profile likely for similar reasons.

The trial court also found that although Mother had weekly visitation, recently she had been late for several visitations with Aurelia and had cancelled several others. Further, Mother did not actively engage with Aurelia when she did attend. For instance, Mother spent time on her phone, gave her phone to Aurelia to watch shows, counted down the time left on the visit, and directed Aurelia to play with toys, but did not get up from her seat to play with her. Mother also gave birth to a new baby and demonstrated difficulty in caring for both Aurelia and the baby at the same time.

The trial court found that despite completing items on her case plan, the same concerns for the safety of any child in Mother's care remained. The trial court changed the permanent plan to adoption with a secondary plan of guardianship. Mother did not appeal the permanency planning order.

On 7 June 2024, DSS filed a Motion for Termination of Parental Rights. On 12 September 2024, Mother filed a Motion in Limine to sever her termination of

parental rights trial from Father's or in the alternative to prohibit DSS from admitting statements from Father against Mother should he not appear at trial.

On 26 November 2024, another permanency planning hearing was held. Mother did not appear at the hearing. Her attorney was unavailable as well but consented to DSS conducting the hearing without him with the stipulation that no new substantive information be presented to the court. The trial court continued all previous plans and continued the termination of parental rights hearing to a date when all parties could be present.

On 22 January and 19 February 2025, the termination of parental rights hearing was held for both Mother and Father. There is no evidence the trial court ever ruled on Mother's motion to sever the trials. The trial court heard testimony from the DSS social worker, Dr. Cappelletty, and Mother. The trial court also accepted letters from Mother's friend and family member. The trial court found grounds existed to terminate Mother's parental rights for neglect and willfully leaving Aurelia in foster care for more than 12 months without demonstrating reasonable progress correcting the conditions that led to her removal as set forth in N.C. Gen. Stat. §7B-1111(a)(1) and (2). The trial court also found that termination of parental rights was in Aurelia's best interests. On 18 March 2025, the trial court entered an order terminating Mother's parental rights to Aurelia. Mother timely appeals from this order.

## II.    Analysis

On appeal Mother contends the trial court erred because (1) the termination order was not supported by the evidence; and (2) the determination of her unfitness is a logical impossibility based on the facts of the case. We disagree.

## A. Termination not Supported

First, Mother contends the evidence does not support the termination of her parental rights. She challenges parts of findings of fact 20, 21, and 23, asserting that portions of each should be disregarded because they were based on inadmissible hearsay. Mother further asserts that the remaining findings do not support the determination that Mother failed to follow through on recommended services as required by her case plan.

"We review a trial court's adjudication that grounds exist to terminate parental rights 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re B.R.L.*, 379 N.C. 15, 17–18, 863 S.E.2d 763, 767 (2021) (quoting *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49 (2019)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re J.C.J.*, 381 N.C. 783, 787, 874 S.E.2d 888, 892 (2022) (quoting *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019)).

### 1. Hearsay

Mother objects specifically to sentences five and seven in finding of fact 21 and sentence six in finding of fact 20: (5) Mother "has failed to successfully address the issues of domestic violence by continuing to have volatile relationships with [Father] and [Husband]."; (7) "She has failed to refrain from exposing the juvenile to significant domestic violence and substance use."; and (6) Mother "let [Father] back into her home in November of 2023."

Mother contends these statements were based on the social worker's testimony regarding what Father's said to the social worker when she visited him in jail and any testimony concerning what Father said should have been ruled as inadmissible hearsay. We disagree.

N.C. Gen. Stat. 8C-1, Rule 801(d) allows a hearsay exception for admissions of a party-opponent and states:

> Exception for Admissions by a Party-Opponent.--A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship or (E) a statement by a coconspirator of such party during the course and in furtherance of the conspiracy.

N.C. Gen. Stat. 8C-1, Rule 801(d). This Court has repeatedly held "[i]n abuse, neglect, and dependency actions, the parents are party opponents to the petitioner-

complainant." *In re A.J.*, 289 N.C. App. 632, 638, 891 S.E.2d 25, 30 (2023), *rev'd on other grounds*, 386 N.C. 409, 904 S.E.2d 707 (2024); *see also In re J.M.*, 255 N.C. App. 483, 489, 804 S.E.2d 830, 834 (2017). This Court has consistently held that when a parent, as a party to the action, makes statements to a social worker about the other parent's conduct, those statements can "'reasonably [be] considered as admissions by [them] that [the juvenile was] subjected to conduct in [their] presence which could be found to be abusive and neglectful.' Therefore, the [parent's] statements were properly admitted pursuant to N.C. [Gen. Stat.] § 8C-1, Rule 801(d)." *In re J.M.*, 255 N.C. App. at 489, 804 S.E.2d at 834 (quoting *In re Hayden*, 96 N.C. App. 77, 81, 384 S.E.2d 558, 561 (1989)). The trial court did not err in allowing Father's statements to the social worker.

Even assuming *arguendo* Mother is correct and Father's statements should have been excluded, additional evidence still supports the trial court's findings.

The social worker testified, "[W]hen I asked [Mother], she confirmed that she had been with him for a day, but then changes it to maybe a couple of days." Additionally, the social worker's testimony included:

> Q. I think you said she only admitted him being in the apartment for four days after forcing himself in; correct?
>
> A. During that meeting where I confronted her about this information, she gave me different dates. So she first started with a day, then she said maybe three, and then she ended up saying maybe four. So I never got a clear answer how long he was there.

Q. She admitted to texting with [Father], during that time; didn't she?

A. Yes. Cause she explained to me when I asked her why she would do that, she said she just wanted to make sure where his head was at with this case and that if he was trying to get her back in his custody.

Q. And she claims that he went through her phone?

A. Yes.

Q. While he was in her apartment?

A. Yes.

Q. Okay. And she had left for work and came back for those days that he was in the apartment?

A. Yes. And I confirmed that as well through neighbors because he ended up knocking on their door several nights trying to get the wi-fi password.

Q. Okay. So when you confronted her about that you said, "Did you go to work when he stayed in your apartment for those four days?"; - -

A. Yes.

Q. - - correct? And she acknowledged leaving with him in the apartment, coming back to it?

A. Yes.

Q. Did you ask her why she didn't call for help or anything during that time if he forced himself in and wouldn't leave?

A. Yes. I asked why she didn't try to contact me, or law enforcement, or tell somebody at work what was going on if he was holding her at the house.

Q. And what was her response?

A. She didn't give us verbal response, she just broke down crying.

Our Court has consistently held that the social worker's testimony regarding a mother's statements to them during a hearing to terminate mother's parental rights is properly allowed as a statement by a party opponent. "[A] statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual or a representative capacity. . . ." *In re S.W.*, 175 N.C. App. 719, 723, 625 S.E.2d 594, 597 (2006) (quoting N.C. Gen. Stat. § 8C–1, Rule 801(d)).

Finally, the social worker testified that Mother's video phone contact with the juvenile had to be stopped, in part, because [Father] who had no contact with the foster family or the juvenile was able to describe the foster home and its occupants from information Mother had shared with him. This portion of the social workers testimony concerning Father is nonhearsay evidence as "[t]his Court has held that statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as nonhearsay evidence." *State v. Thomas*, 350 N.C. 315, 339, 514 S.E.2d 486, 501 (1999). The social worker's testimony provided context for her subsequent action of suspending Mother's calls.

Mother also testified concerning the events of the incident in 2023.

A. I was sitting out in the parking lot of my apartment. I was getting out of the car and getting [younger child] out. And I had just got, picked [younger child] up after I got off of work and I was getting her out and then he just popped upon me. I didn't ever see him out of nowhere or nothing.

Q. How did he get in your apartment?

A. He shoved me in my apartment.

Q. And, but he let you leave to go to work?

A. No. I didn't go to work, well - -

Q. You told Dr. Cappelletty you did, didn't you?

A. No.

Q. You just stayed in that apartment for four days?

A. Yes. He took my phone away from me. And I don't even think it was four days to be honest with you. I really can't remember. But the final day he let me, I told him that if I don't go to work that they're going to do a well check. And then once he allowed me to leave to go to work, that's when I called my court advocate and I was telling her about him being there. And she called the law and I called the law and he was arrested.

. . .

Q. But you admitted that he stay, he stayed there four days at least?

A. Like, it was less. At the most it'd be four days. I really can't remember how long he was there, but it definitely wasn't over - -

Notwithstanding Father's statements, the social worker's testimony and Mother's own testimony clearly support the trial court's findings that Mother allowed

Father into the apartment, Mother continued to expose juveniles to domestic violence, and Mother continued to have ongoing violent relationships. Although the evidence could have been interpreted in different ways, we cannot say the trial court erred in the inferences it drew from the evidence.

> Where the trial court sits as the finder of fact, and where different reasonable inferences can be drawn from the evidence, the determination of which reasonable inferences shall be drawn is for the trial court. . . . The trial court's findings turn in large part on the credibility of the witnesses, and must be given great deference by this Court.

*Stancill v. Stancill*, 241 N.C. App. 529, 531-32, 773 S.E.2d 890, 892 (2015) (quoting *Brandon v. Brandon*, 132 N.C. App. 646, 651-52, 513 S.E.2d 589, 593 (1999)). The trial court clearly gave more weight to the testimony of the social worker than to Mother's inconsistent accounts. The trial court did not err in its determination, as it is a trial court's position to judge the credibility of witnesses. "Because '[t]he trial court is in the best position to weigh the evidence, determine the credibility of witnesses and the weight to be given their testimony,' we refuse to re-weigh the evidence on appeal." *Williamson v. Williamson*, 217 N.C. App. 388, 392, 719 S.E.2d 625, 628 (2011) (quoting *Goodson v. Goodson*, 145 N.C. App. 356, 362, 551 S.E.2d 200, 205 (2001)). The findings of fact concerning domestic violence were supported by competent evidence.

However, the portion of the finding stating Mother continued to expose the juvenile to substance use, was not supported as there was no testimony that Mother

used or exposed anyone to drugs after Aurelia was removed and Husband died. As that portion of the finding is unsupported, we disregard it. *In re S.M.*, 375 N.C. 673, 690, 850 S.E.2d 292, 306 (2020).

**2. Following Recommended Services**

Mother also objects to the portions of findings of fact 20, 21, and 23 that found she had not sufficiently engaged in the necessary services based on her case plan. Mother's case plan as set forth at her first permanency planning hearing on 16 May 2023 required that she: complete a Comprehensive Clinical Assessment ("CCA") and follow any recommended services; submit to random drug screens at the request of the Department; sign a release of information for the Department to communicate with any agency providing Mental Health services; complete a domestic violence support group and follow any recommended domestic violence services; inform the Department of any domestic violence; obtain independent housing that is safe and free of hazards and must maintain housing for more than 6 months; inform the Department of any residence change; provide her current address along with individuals living in the home to complete background checks; obtain and maintain employment and inform the Department of any changes; attend all scheduled visitations and maintain appropriate conversations during visitations as well as demonstrate parenting skills; complete and engage in an approved parenting program and show skills learned during visitations with the children; gain and

exhibit understanding of how domestic violence affects the child; and complete a parenting capacity assessment and provide truthful information.

Mother contends it is undisputed that she was in the Options program at the outset of her plan and while there completed a CCA and attended services; therefore, any conclusion by the trial court that she was "not sufficiently engaged" is unsupported and "does not fully convince." We disagree.

We acknowledge Mother was enrolled in the Options program at the outset of her plan, and while there completed a CCA and attended services; however, this is a fraction of the evidence presented at the hearing. Dr. Cappelletty testified at length concerning the two psychological evaluations/parental capacity assessments she completed with Mother. The first was completed in 2021 during her initial plan concerning her two older children. The second was completed in 2023 as required by the trial court in this matter. Dr. Cappelletty testified that Mother's profile on the 2023 personality assessment inventory was invalid because the responses were distorted as Mother was not forthcoming and "may be blindly uncritical to her own behavior and insensitive [to] consequences associated with that behavior." Additionally, Dr. Cappelletty stated that her "concern is less about her knowledge base of how to be a protective parent, [but] rather her ability to follow through . . . with what she already knows to be protective parenting." Finally, Dr. Cappelletty testified that Mother acknowledged she was staying in places other than her official home that she reported to DSS.

Similarly, the social worker testified Mother was initially getting help for domestic abuse and parenting classes through Options. Mother reported to the social worker that she was leaving Husband and Options would help her file for divorce. However, before Mother moved forward with divorce, Husband died and Mother disclosed she was pregnant with his child. Mother stopped services with Options in July 2024. Throughout the case, Mother's employment was inconsistent and DSS had difficulty confirming any employment because Mother would not provide direct information. Mother never completed any other service programs and DSS remained concerned that she does not understand the impact of domestic violence on her children. The social worker also testified Mother is not forthcoming with information about housing, so DSS was unable to verify whether she had stable and safe housing. She seemed to be staying with friends and family regularly and was not at her apartment whenever DSS attempted home visits. Neighbors also reported to DSS that they never saw Mother at home.

Finally, Mother testified that she started services in February 2023 at Options, but she did not remember when she stopped attending. She testified there was some information on domestic violence and parenting, but she was not sure what type of therapy it was. She reported giving her lawyer the certificate from the class but did not provide anything to DSS. She reported that she was very upset when Husband died and named the youngest child after him. Mother's testimony was inconsistent

Opinion of the Court

with the facts of the previous adjudication hearing and when the inconsistencies were pointed out Mother just repeated, "I don't remember."

Based on this testimony by Mother, Dr. Cappelletty, and the social worker there is clear and convincing evidence upon which the trial court could rely in its determination that while Mother "participate[ed] in some of these activities at one point," she has failed to make satisfactory progress under the circumstances in correcting the conditions which led to the removal of Aurelia. N.C. Gen. Stat. §7B-1111(a)(2). Additionally, the timeline of Aurelia's pendency in DSS custody was clearly greater than the twelve months required to terminate parental rights under N.C. Gen. Stat. §7B-1111(2). Aurelia entered non-secure custody on 16 February 2023, was still in custody when the motion to terminate parental rights was filed on 7 June 2024, and remained in custody at the time of the hearing. "Because a finding of only one ground is necessary to support a termination of parental rights, we only address respondent-mother's argument regarding the basis for termination of her willful failure to make reasonable progress." *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019). The trial court did not err in finding grounds existed to support the termination of Mother's parental rights.

**B. Logical Impossibility**

Next Mother contends it is a logical impossibility that she is unfit to parent Aurelia when she has not been found to be unfit to parent her youngest child.

Mother relies on *In re A.W.*, 280 N.C. App. 162, 173, 867 S.E.2d 235, 243 (2021) in support of her contention. In *In re A.W.* the county DSS reduced their categorization of the perceived risks in the home to moderate and dismissed a neglect petition for the younger child while simultaneously stating the parents were unfit to parent their older child. Additionally, the evidence demonstrated that respondents completed their case plan for the older child, there were no allegations of domestic violence in over a year, and the trial court failed to make statutorily required findings of fact. Therefore, this Court held there was error when "the order does not explain how the Respondents can be fit and proper parents for the younger child but not for [the older child]." *In re of A.W.*, 280 N.C. App. 162, 168, 867 S.E.2d 235, 240 (2021). Mother's reliance is misplaced.

Here, at the onset of Aurelia's case, Mother resided in Caldwell County, therefore Caldwell County DSS has been overseeing Aurelia's case. Mother moved to Burke County after the case was initiated. Mother then gave birth to her youngest child in Burke County. Caldwell County DSS noted concerns with the youngest child, particularly with her physical development, and attempted to monitor the child by having Mother bring her to visitation with Aurelia. The children's medical provider also reached out to Caldwell County DSS, knowing they had custody of Aurelia, to report concerns about the youngest child not receiving necessary medical care. Caldwell County DSS informed the provider they did not have custody of the youngest child and advised how to report their concerns to Burke County DSS. Although

Caldwell County DSS was concerned for Mother's youngest child, it determined it did not have authority to intervene and could only report those concerns to Burke County. As Caldwell County DSS was not in a position to investigate the younger child, there is little to no information from which the trial court could make any comparison between Aurelia and the younger child. Further, there is ample evidence that Mother did not complete her case plan in order to reunify with Aurelia. Therefore, the trial court maintained its sole determination as to the facts of Aurelia's case.

Mother did not complete her case plan for Aurelia, was resistant to DSS intervention, struggled to appropriately parent both children during visitation, engaged in domestic interactions with Father after entering into the plan and beginning services and as noted *supra* grounds existed to terminate Mother's parental rights.

## III. Conclusion

For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights.

AFFIRMED.

Judge COLLINS and STADING concur.

Report per Rule 30(e).